**S. Tenney McGRAW, Plaintiff,**

v.

**Konrad H. MATTHAEI, Defendant.**

**Civ. A. No. 37965.**

United States District Court, E. D. Michigan, S. D.

March 13, 1972.

---

See also, D.C., 340 F.Supp. 162.

Gerald Simon and Thomas Sweeney, Fischer, Franklin & Ford, Bloomfield Hills, Mich., for plaintiff.

W. Robert Chandler and Laurence S. Schultz, Cross, Wrock, Miller & Vieson, Detroit, Mich., for defendant.

## OPINION AND ORDER

KAESS, Chief Judge.

Plaintiff seeks to recover the balance due on a promissory note. Defendant raises an affirmative defense and counterclaim based upon allegedly fraudulent nondisclosure in the sale of a security.

Plaintiff and defendant were limited partners in The Parsons Investment Company ("TPIC"), a Michigan limited partnership, which was organized in 1963 to acquire two office buildings and certain parking lots in downtown Detroit. Plaintiff and defendant were two of the original eleven partners, and each initially invested $100,000.00 in the partnership. In 1964, TPIC acquired 150,005 shares (approximately 25%) of the common stock of Bank of the Commonwealth, a major Detroit bank. At this time plaintiff and defendant each invested an additional $100,000.00, for a total investment of $200,000.00 each, for their respective $\frac{1}{11}$ (9.09%) interest. Other than meeting each other once or twice at annual meetings of TPIC, plaintiff and defendant never had any contact with one another.

TPIC was one of a number of limited partnerships formed by Donald H. Parsons, a Detroit lawyer and banker, and numerous other investors between 1960 and 1971. Each limited partnership had a different group of partners, although a number of the investors were partners in more than one partnership. Typically, each partnership had a controlling interest in a different bank or other business. This loose association of partnerships and the banks which they controlled came to be known as the "Parsons Group".

In 1960, plaintiff had become assistant cashier for the Birmingham-Bloomfield Bank, a newly-formed suburban Detroit bank, and the first of the "Parsons" banks. In 1962, he became Vice-President of that bank, and in 1966, he was promoted to the position of President. As President he was the chief operating officer of the bank, and he reported to the Chairman and Vice-Chairman of the Board of Directors, who were the chief executive officers of the bank. Parsons was also an officer of the Birmingham-Bloomfield Bank from 1962 to 1964, and a Director from 1960 to 1968. At various times the Birmingham-Bloomfield Bank shared as many as four common Directors with Bank of the Commonwealth.

Upon becoming President of the Birmingham-Bloomfield Bank, plaintiff was also made a member of its Board of Directors, as was required by state banking laws. He resigned as President in early 1968, but continued as a member of the Board of Directors until the bank was closed by the State Banking Commissioner in February, 1971. It is clear that from the beginning plaintiff had a working knowledge of the management philosophy as generally espoused by the Parsons Group, and as particularly practiced at both the Birmingham-Bloomfield Bank and Bank of the Commonwealth.

After receiving a Bachelor's Degree in English from Yale University, defendant received a Master of Business Administration Degree from the University of Michigan in 1954. Since 1959, defendant has lived in New York City, and his principal occupation has been that of an actor and theatrical producer. During this period defendant also personally handled the investment of his own portfolio of securities, the value of which was in excess of $1,000,000.00.

Defendant first became acquainted with Parsons when they were both students at Yale University. In 1963, Parsons invited defendant to become a lim-

ited partner in TPIC when it was being formed. Defendant discussed this investment with his brother Frederick C. Matthaei, who also became a limited partner in TPIC, before making his initial $100,000.00 investment. In 1964, when defendant was contacted by Parsons to make an additional $100,000.00 investment, defendant again discussed this investment with his brother. On both occasions defendant's brother recommended the investment, and told defendant he was also making the same investment. On neither of these occasions did defendant consult plaintiff regarding this investment. Throughout this period defendant and Parsons were good friends, and socialized occasionally in both New York and in Michigan.

In December, 1966, or January, 1967, plaintiff decided to sell his $\frac{1}{11}$th (9.-09%) interest in TPIC, and he approached Parsons, the principal general partner, regarding the sale of this interest. Parsons told plaintiff he would raise the matter at the annual meeting of the partnership which would be held in February, 1967. Prior to the meeting the partnership's annual report was circulated to all the limited partners, and it showed the value of plaintiff's $\frac{1}{11}$th interest, as of December 31, 1966, as $652,000.00.

At the conclusion of the partnership meeting held in February, 1967, plaintiff was excused from the meeting, and Parsons and the other partners present discussed the purchase of plaintiff's interest. Defendant was not present at this meeting. Several days later Parsons telephoned plaintiff, and told him that Parsons, and an as yet undetermined number of additional partners, were willing to purchase the $\frac{1}{11}$th interest for $700,000.00, with $200,000.00 to be paid on July 15, 1967, and the balance payable over five years in annual installments of $100,000.00 at 6% interest. Plaintiff agreed to these terms. Both Parsons and plaintiff testified that Parsons was not plaintiff's agent in any respect in connection with this transaction.

After reaching agreement with plaintiff, Parsons contacted the other partners in TPIC, including the defendant in New York, and told each partner that a pro rata share of plaintiff's interest was available. Parsons recommended the purchase to defendant, and said it was a good buy at that price. Parsons also said that he would buy defendant's pro rata share if defendant did not want it. Defendant asked Parsons if his brother was buying his pro rata share. Parsons confirmed that he was. Defendant testified that Parsons was candid and honest during the discussion.

Before making a decision, defendant contacted his brother, Frederick C. Matthaei, who, together with Parsons, was a member of the Board of Bank of the Commonwealth. His brother recommended the purchase, and told defendant he was purchasing his pro rata share of plaintiff's interest. Later, defendant told Parsons he wished to purchase his pro rata share of plaintiff's $\frac{1}{11}$th interest in the partnership. Defendant never had any discussions or other contact with plaintiff regarding the sale.

Defendant conceded that he relied solely upon Parsons and his brother Fred Matthaei in making his additional investment in TPIC by purchasing the plaintiff's interest.

The transaction was closed on or about January 15, 1968, when defendant and the other purchasing partners made the $200,000.00 down payment (defendant's pro rata share was $22,222.22), and plaintiff executed separate assignments of the pro rata shares of his $\frac{1}{11}$th interest to defendant and the other purchasing partners. The defendant and the other purchasing partners each executed promissory notes for the balance of their pro rata share of the purchase price (defendant's note was for $55,555.55). Each note provided for equal annual installment payments over five years with interest at 6% per annum. Defendant made the annual payments of $11,111.11, plus interest, on January 15, 1969, and January 15, 1970. The other purchasing partners also

made their pro rata payments on their notes on said dates.

In the spring of 1970, the Parsons empire was dealt a death blow when the Federal Reserve Board rejected an application for a foreign branch. In an unprecedented move, the Federal Reserve publicly stated that "the general character of the Bank of the Commonwealth management and the bank's financial history and condition, including its liquidity and capital position, militate against the approval of these present applications." The economic fall-out of that statement and the events that followed were such that the defendant's investment in TPIC was eventually rendered worthless.

## I.

Jurisdiction of this Court is based upon the provisions of § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1332 (diversity of citizenship). There is sufficient evidence of the use of interstate telephone calls and the mails to satisfy the jurisdictional requirements of 15 U.S.C. § 78j(b).

## II.

■ Defendant's counterclaim was filed on June 7, 1972, and alleged that plaintiff's January, 1968, sale of his TPIC interest to defendant violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and Section 410(a) of the Uniform Securities Act, M.S.A. § 19.776(410)(a), M.C.L.A. § 451.810(a). In Paragraph 15 of Count I of defendant's Counterclaim, filed June 7, 1972, it states:

"Defendant was not aware of said omission to state material facts by plaintiff at the time this defendant purchased his limited partnership interest, and did not discover said omissions until on or about the spring of 1970."

Despite the obvious invitation which the Counterclaim extended, the Statute of Limitations was not raised until a Mo-

tion to Amend the Pleadings was made on the last day of trial, nearly two years after the Counterclaim was filed. The Statute of Limitations is a defense which, under Rule 8(c) of the Federal Rules of Civil Procedure, must be set forth affirmatively in a responsive pleading. In determining whether or not to allow an amendment to the pleadings pursuant to Rule 15, the Court may properly consider whether the party seeking leave to amend should have been aware of the possible existence of the defense at an earlier time. Faith v. Texaco, Incorporated, 48 F.R.D. 118 (D.C.Mich.1969). In *Faith*, the Court set forth the rule governing amendments pursuant to Rule 15(a), as follows:

"Federal Rule 15(a) requires that leave to amend pleadings be freely granted 'when justice so requires.' However, it is equally true that such leave should be denied '[when] the amendment would cause substantial prejudice to a party to the action.' Strauss v. Douglas Aircraft Co., 404 F.2d 1152, 1155 (2d Cir. 1968). The Court must carefully balance the effect of permitting an amendment of this type, 'for it is manifest that risk of substantial prejudice increases in proportion to the length of defendant's delay in seeking the amendment.' " *Id.* at 120.

In the nearly two years since defendant filed his Counterclaim, he has incurred substantial expense in deposing plaintiff, obtaining records relating to the operations of Bank of the Commonwealth, interviewing prospective witnesses, obtaining an expert witness who testified at the trial, and most significantly, spending five days in trying the case. In addition, defendant was deprived of the opportunity to present evidence relating to the Statute of Limitations defense as a result of plaintiff's failure to raise the defense until the last day of trial. In Basko v. Winthrop Laboratories, Inc., 268 F.Supp. 26, 28–29 (D.C.Conn.1967), the Court, in finding that defendant had waived the defense of the Statute of Limitations by not

pleading it until ten months after it had filed its answer, stated:

". . . If counsel believed that any serious question might exist as to possible expiration of the relevant statutory limitation periods, then in fairness to all parties the defense of the statute of limitations should have been explicitly preserved in the answer . . ."

If plaintiff had a question as to whether or not the Statute of Limitations applied, he should have at least attempted through discovery to ascertain the facts that he felt were necessary to resolve the issue, as is evident from the following statement in *Faith, supra,* 48 F.R.D. at 121:

"During this extra time they should have recognized that the statute of limitations was a possible issue, since the complaint itself was somewhat vague as to the onset of the injuries. Discovery was available to the defendants if they required more information in this regard."

Plaintiff did not raise the question in his interrogatories, which were submitted in August of 1972. Having done nothing for two years, plaintiff cannot now assert the defense. The provisions of Rule 15(b), dealing with amendments to conform the pleadings to the evidence, afford no added leverage to the plaintiff. The Statute of Limitations was not mentioned until the final day of trial, and counsel for defendant strenuously objected to plaintiff's raising the Statute of Limitations defense. In Gaines W. Harrison & Sons, Inc. v. J. I. Case Company, 180 F.Supp. 243 (D.C.S.C. 1960), plaintiff testified at trial that the alleged implied contract could not be completed within one year, and defendant moved to amend his answer to assert the *Statute of Fraud* defense. The Court denied the motion, stating as follows, at 248:

"The defendant's contention that Rule 15(b) of the Rules of Civil Procedure requires the answer to be amended to permit the Statute of Frauds defense

is patently unsound. The issue as to the Statute of Frauds was not 'tried by express or implied consent' of the plaintiff. As soon as the Statute of Frauds was raised, the plaintiff took the position that it was not before the Court because it had not been pleaded."

For these reasons, plaintiff's Motion to Amend the Pleadings is denied.

### III.

The statutory basis for defendant's affirmative defense and counterclaim is Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 thereunder. Rule 10b–5 provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(1) To employ any device, scheme or artifice to defraud,

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or *deceit upon any person,*

in connection with the purchase or sale of any security."

Defendant's position is based principally on Clause 2 of the Rule, and it is his position that the following material facts were omitted by plaintiff in connection with the sale of his TPIC interest:

1. That the Bank of the Commonwealth had adopted and was following basic asset management and investment policies which were contrary to policies of bank regulatory agencies,

and which were criticized by said agencies.

2. That Bank of the Commonwealth's asset management and investment policies were contrary to the policies of the other major Detroit banks and other banks in general, rendering Bank of the Commonwealth materially less liquid than said banks.

3. The illiquid condition of Bank of the Commonwealth, as of December 31, 1966, and December 31, 1967, which was evidenced by (a) the ratio of liquid assets to deposits, (b) the ratio of tax-exempt securities to deposits, (c) the average maturity of the municipal bond portfolio, (d) the ratio of gross loans to deposits, and (e) the ratio of capital to deposits.

The foregoing recitation is essentially a statement that Bank of the Commonwealth, under the direction of Donald Parsons and his associates, espoused a management philosophy which differed significantly from conventional thinking, and which adversely affected the bank's liquidity, as that term was defined and used in conventional banking circles and by those agencies which regulate banking activities. There is no serious dispute, and the Court so finds, that such was the case.

Much has been made of the regulatory agencies and the criticisms which were made by them of the bank's operation. The Court does not attach independent significance to this fact alone for various reasons. In the first place, if any one thing was important and significant, it was the basic management philosophy of Bank of the Commonwealth; that was the distinguishing feature and, to the extent that there was criticism by the regulatory agencies, that criticism may be considered but symptomatic of the aforementioned philosophy. The fact of such criticism, therefore, is considered probative, but not independently controlling. Moreover, the evidence shows that, during much of the period in question, the bank's relationship with the regulatory agencies was unusually harmonious; it was not until the latter part of 1967 that there were criticisms of the bank's liquidity position. Finally, it is undisputed that it is the job of the regulatory agencies to constructively criticize, and it would be a rare audit, indeed, that contained no objections. Objections are the rule rather than the exception, and there was no evidence that objections in late 1967 were excessive, unprecedented or extraordinary.

The management philosophy of Bank of the Commonwealth, however, was, in itself, an important and material fact. The Court does not feel that there was a failure to disclose such fact, however, for the reason that the defendant was fully aware of the essence of the situation at the time of the sale. While the evidence does not disclose that the defendant was aware of the technical financial subtleties of the bank's operation, it most definitely belies his assertion that he considered an investment in Bank of the Commonwealth to be a conservative one. The defendant's own testimony was to the effect that he was personally aware of Donald Parsons' meteoric rise to success; that Parsons was a charming, but controversial, figure; that the galloping success of the Parsons Group was chronicled in the popular press, and that the defendant read these accounts and discussed them with his brother Fred and Parsons himself. The defendant also testified to having read an article, in the December, 1968, edition of *Fortune* magazine, entitled, "Is This Any Way to Run Ten Banks?". This article alone either discusses or alludes to nearly all those facts which are now contended to have been undisclosed information, including the criticisms of regulatory agencies. The article hardly portrays Donald Parsons as a conservative soul plodding along with the mainstream of American banking thought, nor does the article gloss over the fact that some observers considered the Parsons' approach to be inherently risky. Even though this article was published after the consumation of the sale, it is significant that it did not affect defend-

ant's attitude toward his investment nor deter him from making the annual installment payments as they fell due. The Court finds that the defendant was aware of the essence of all the material facts that reasonably could have, but apparently did not, influence his investment decision at the time of the instant transaction.

■ Even assuming that the defendant lacked some material information, which the Court feels was not the case, the plaintiff herein was under no obligation to disclose such information. This area of securities law is variously discussed in terms of duty to disclose, scienter, and the exercise of due care. It would appear that an accurate synthesis of the law would be this: The seller has a duty to disclose those material facts which would not be revealed by the buyer's exercise of due care. See, Kohler v. Kohler Co., 319 F.2d 634 (C.A.7 1963); Arber v. Essex Wire Corp., 490 F.2d 414 (C.A.6 1974); SEC v. Coffey et al., 493 F.2d 1304 (C.A.6 1974); Niedermeyer, et al. v. Niedermeyer, et al., CCH Fed.Sec.L.Rep. ¶ 94123 (D.C.Or.1973). In the instant case, the defendant attempted to demonstrate the unorthodox posture of Bank of the Commonwealth by the computation of certain financial ratios and the comparison of those ratios to those of other Detroit banks. This comparison did, in fact, show that Bank of the Commonwealth was unique in numerous respects. All of the ratios used in the comparison, however, were derived from data readily available to the public in the form of annual reports and the like. Moreover, the activities and policies of the Parsons Group were widely reported in the popular press. The Court's holding in Arber v. Essex Wire Corp. seems particularly germane to the decision of the instant case:

"Appellants also claim that appellees did not disclose book value which was substantially greater than the offer price, and other financial data such as earnings per share. This information, however, was readily available to appellants who, although aware of its existence and availability, were simply uninterested. We hold that an insider has no affirmative duty to direct a seller's attention to all routine data commonly found in the statements and books of the corporation, at least where the information is readily available; the outsider has knowledge that it is available and makes no inquiry; and the information thus available is not of an unusual or extraordinary nature." 490 F.2d at 420.

Defendant contends that he escapes the rule of *Arber* because the information herein considered is "unusual" in nature. The Court cannot agree. Financial indicators, such as Liquidity Ratio, Loan to Deposit Ratio, and Capital to Deposit Ratio, were employed to demonstrate the condition of Bank of the Commonwealth. These concepts are hardly tangential or obscure, but, in the context of an analysis of a banking investment, are the usual and ordinary things to which a reasonable investor would look.

■ It is clear that the defendant herein has failed to comport himself as would a reasonable investor. A sizeable investment was made on nothing more than the cursory recommendations of a friend and a brother, both of whom were so heavily involved in the venture that their ability to objectively analyze and recommend an investment was obviously destroyed. A reasonable investor would certainly have done more than did the defendant herein. That the defendant was burdened with such a duty is clear. In City National Bank of Fort Smith, Ark. v. Vanderboom, 422 F.2d 221 (C.A.8, 1970), cert. den., 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970), the Court indicated:

"We feel that step one of our test properly reflects these considerations as the objective standard of a reasonable investor exercising due care in light of all facts effectively imposes a duty of reasonable investigation, thereby limiting the class of investors who will be protected under 10b–5(2)

to conscientious buyers and sellers in good faith." 422 F.2d at 230, n. 10. In Clement A. Evans & Co. v. McAlpine, 434 F.2d 100 (C.A.5, 1970), the plaintiff sought recovery for an alleged § 10(b) violation. The Court of Appeals approved as a correct statement of the law the following instruction, an instruction (and finding) which applies with equal force to the defendant herein:

"If you find from the evidence in this case that the plaintiff had knowledge of facts sufficient to excite its inquiry, and that the peculiar circumstances of this case were sufficient to impose upon the plaintiff a duty of reasonable diligence, and that the plaintiff failed to exercise this duty, then you should return a verdict for the defendants." 434 F.2d at 102.

An investor who casually makes investments, and who blindly rides bubbles until they burst, does so at his own risk, and cannot later invoke § 10(b) as a form of "investor's insurance". This fact of life and law was tacitly recognized by the defendant when he testified with regard to the instant investments: ". . . they took relatively little of my time, *in retrospect they should have taken a lot more.*" (Emphasis supplied).

■ Much attention has also been directed toward determining who was an insider and who was an outsider. With respect to TPIC, both parties were limited partners, and thus, technically, outsiders. With regard to the overall operation of the Parsons Group, however, it is clear that plaintiff was in daily contact with same while defendant was not. As an officer and director of a bank which was part of the Parsons Group, plaintiff was directly involved in effecutating the policies thereof. Moreover, plaintiff's career experience was such that he was undoubtedly better able to digest that information which he had. The fact remains, however, that the defendant had (or had access to) essentially the same material information as that which plaintiff had. Plaintiff's superi-

or expertise and understanding of the field in which the investment was made are not sufficient to create liability:

"Nor is an insider obligated to confer upon outside investors the benefit of his superior financial or other expert analysis by disclosing his educated guesses or predictions. 3 Loss, op. cit. supra at 1463. The only regulatory objective is that access to material information be enjoyed equally, but this objective requires nothing more than the disclosure of basic facts so that outsiders may draw upon their own evaluative expertise in reaching their own investment decisions with knowledge equal to that of the insiders." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848–849 (C.A.2, 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971).

In the instance case, the basic facts were available to all.

## IV.

■ Defendant also asserts that Parsons acted as the agent of plaintiff in the sale of the TPIC interest, and thus, a finding of derivative liability is in order. It is clear that Parsons, to an extent, acted as an intermediary in the instant transaction, but, on the whole, it is equally clear that his alignment was with the buyer's side rather than the seller's. At no point in the negotiations was Parsons authorized to do anything which would bind the plaintiff. Rather than accepting an offer on plaintiff's behalf, Parsons was the one who, on behalf of himself and others, extended an offer to the plaintiff. The relationship between the plaintiff and Parsons was that of arm's-length buyer and seller. Parsons offered to personally buy plaintiff's entire interest himself in the event that the others did not care to join the venture. Plaintiff cannot be held liable for those things which Parsons subsequently said or did not say in his efforts to sort things out among himself and the prospective buyers. When Parsons ap-

proached defendant, he was acting solely on his own behalf for by that time he and plaintiff had already made a firm deal, and Parsons was possibly obligated for the entire $700,000.00 purchase price.

Any argument based upon § 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, is equally unavailing. This Section provides:

"(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

(b) It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for any such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person."

It is true that in order to establish control within the meaning of § 20(a), it is not necessary to establish a strict agency relationship. Rather, it is only necessary to show some indirect means of discipline or influence to find that a person is a controlling person within the meaning of the Section. Myzel et al. v. Fields, 386 F.2d 718 (C.A.8, 1967), cert. den., 390 U.S. 951, 88 S.Ct. 1043, 19 L. Ed.2d 1143.

Based upon the evidence adduced at trial, and for the reasons heretofore given in the discussion of the agency issue, this Court is unable to find, as a matter of fact, that the plaintiff herein was a "controlling person".

This Court's findings with regard to defendant's § 10(b) claim are equally dispositive of defendant's state law claim. Arber v. Essex Wire Corp., *supra,* 490 F.2d at 421.

For the foregoing reasons, it is ordered that judgment be entered for plaintiff and against the defendant, and that defendant's Counterclaim be dismissed on the merits.