John L. NERENHAUSEN, Plaintiff,

v.

CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, a Wisconsin corporation, Defendant and Third Party Plaintiff,

v.

WESTINGHOUSE AIR BRAKE COMPANY, CONSTRUCTION EQUIPMENT DIVISION, Third Party Defendant.

Civ. No. 4–76–157.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 31, 1979.

Neuman O. Berger, Rerat Law Firm, P. A., Minneapolis, Minn., for plaintiff.

Roger R. Roe, Jr., Rider, Bennett, Egan & Arundel, Minneapolis, Minn., for defendant and third party plaintiff.

Henry A. Cousineau, Cousineau, McGuire, Shaughnessy & Anderson, Minneapolis, Minn., for third party defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

Plaintiff Nerenhausen brought this action under the provisions of the Federal Employers Liability Act, 45 U.S.C. §§ 51–60, against defendant Chicago, Milwaukee, St. Paul & Pacific Railroad Company [hereinafter the railroad] in April of 1976. Plaintiff, an employee of the railroad, claimed that the railroad failed to provide a safe place for him to work, and as a result, the railroad was liable for injuries he sustained on January 31, 1975, when plaintiff fell off a railroad owned piece of heavy equipment known as a LeTorneau dozer. In August of 1977, the railroad impleaded the Westinghouse Air Brake Company, Construction Equipment Division [hereinafter Westinghouse], the manufacturer of the LeTorneau dozer, under Fed.R.Civ.P. 14 as a third party defendant, and alleged that the railroad "would be entitled to indemnity and/or contribution" from Westinghouse in the event it was held liable to plaintiff. At trial, the railroad proceeded under negligence and strict liability theories against Westinghouse, and the jury was duly instructed at the request of the railroad under both theories. After a one week trial, the jury returned its special verdict on May 30, 1979, and found that the defendant railroad was liable to plaintiff Nerenhausen for its negligence under the Federal Employers Liability Act in the amount of $150,000. The jury also found Westinghouse negligent in its design or manufacture of the LeTorneau dozer, and also liable under strict liability principles for the design and manufacture of an unreasonably dangerous product. The basis for the jury's conclusion that Westinghouse designed and/or manufactured an unreasonably dangerous product was that Westinghouse failed to provide a suitable or safe method in which to dismount from the dozer. The jury, after comparing the relative culpability between the railroad and Westinghouse, found each party 50% at fault for plaintiff's injuries. The jury also found that plaintiff Nerenhausen did not contribute in any way to cause his injuries. Pursuant to the jury's special verdict, the Court subsequently entered an order for judgment which provided that the railroad was liable to plaintiff in the amount of $150,000, and that Westinghouse was liable to the railroad in the amount of $75,000 pursuant to the claim of contribution.

Each of the parties has made a specific posttrial motion. Plaintiff Nerenhausen has moved to "amend his complaint to conform to evidence adduced at trial and the verdict" as well as to "amend the judgment entered in this case to allow judgment in favor of plaintiff directly against Westinghouse." The foundation of plaintiff's motion is Fed.R.Civ.P. 15(b). Third party defendant Westinghouse has moved for an order altering the judgment in its favor or alternatively, for a new trial. The railroad has moved to be indemnified by third party defendant Westinghouse. In order to evaluate the merits of these posttrial motions, the developments at trial should be briefly outlined.

As a general foreman for the railroad, John Nerenhausen was engaged in the repair and construction of railroad track in the Minneapolis area. On January 31, 1975, Nerenhausen reported to work and was assigned, along with the operator of the machine, to plow snow off the track with the LeTorneau dozer as well as to check for oncoming trains along the track which was being plowed. In this capacity, the plaintiff acted as a "pilot" or supervisor of the plowing pursuant to the railroad's policy of requiring two persons to ride on the machine. This policy appears to contradict Westinghouse's admonition in its operators manual that only one person use or be on the LeTorneau dozer. The LeTorneau dozer or tractor dozer in question was a "skid-steer" piece of heavy equipment which the railroad used to plow heavy snow. According to the testimony of John Hyler, who took part in the design of the LeTorneau dozer, a skid-steer machine is a machine

where the relative rotation of the wheels on one side, as opposed to the rotation of the wheels on the other side of the machine, determines the degree of the turn. On this below zero day, after extensive plowing, Nerenhausen slipped and fell off the LeTorneau dozer when he attempted to dismount from the right side of the machine. According to his testimony, plaintiff's foot either slipped off an insert which the operators used for support when stepping down or he lost his grip on the tire. Plaintiff stated that as a result of the fall, all his weight was placed on the right side of his foot, which was bent at an angle when it came in contact with the ground. As a consequence, plaintiff sustained a fracture near the base of the fifth metatarsal of the right foot. This fracture, for undetermined reasons, failed to unite for approximately 8 months, which created a painful condition as well as other problems for John Nerenhausen. Further, the medical testimony indicated that the subsequent lumbar back discomfort suffered by John Nerenhausen was causally linked to plaintiff's fall from the LeTorneau dozer on January 31, 1975.

The LeTorneau dozer in question here was developed under the direction of R. G. LeTorneau, an engineer and president of R. G. LeTorneau, Inc., which sold the earthmoving portion of its business to third party defendant Westinghouse in 1953. This tractor dozer was designed in 1947 and the particular LeTorneau dozer from which plaintiff fell was sold to the railroad by third party defendant Westinghouse in 1955. The railroad used the machine infrequently in recent years, and almost exclusively for plowing heavy snow. The LeTorneau dozer was, however, a heavy duty machine which could be used for a multitude of purposes. On a skid-steer machine, the tires are normally set close together in order to obtain maximum efficiency in negotiating a turn. The wheels of the tractor dozer are approximately five feet high and approximately 1½ feet wide.

The testimony established that the common practice of the railroad employees who used the LeTorneau dozer was to dismount from the right side of the machine, either by sliding or jumping down, or as plaintiff did on January 31st, by placing one foot in the final step down on an insert which sticks out approximately three inches from the machine, and then placing both hands on the wheels and lowering his body to the ground. This final step in the lowering process is approximately two feet. All of the testimony indicated that the railroad never provided any instructions to its employees with respect to mounting or dismounting the LeTorneau dozer.

There was some dispute during the trial as to whether it was easier to mount or dismount from the left side or the right side of the machine. Westinghouse contended that it was easier to mount or dismount from the left side of the machine, as the tires were closer to the body of the machine. Both Warren Voight, an operator of the machine, and plaintiff indicated that it was easier to mount or dismount from the right side of the machine, as plaintiff did when he fell from the machine, because there was more room to maneuver and to stand. Another railroad employee and the railroad's expert witness indicated that there was no substantial difference in mounting or dismounting from either side. The operators manual for the LeTorneau dozer supplied by Westinghouse was silent on the issue of which side of the machine was safer for mounting and dismounting. There was also evidence which dealt with a canvas shroud used for warmth and protection which was attached to the LeTorneau dozer by the railroad, although plaintiff indicated that the canvas which was attached to the machine on January 31, 1975, was not an obstacle insofar as dismounting from the machine was concerned.

Nerenhausen indicated in his testimony that if the dozer had been designed with a grab iron, ladder or foot rest, it would have made "all the difference in the world" in preventing or at least reducing the impact of his fall. It was undisputed that the LeTorneau dozer was not designed with any handholds, ladders, grab irons, steps, footholds, toeholds, or other safety devices commonly used to aid the user in mounting or

dismounting during the time period when the dozer was designed and manufactured. The railroad's expert witness, Fredrik Waleson, an engineer and designer of off the road heavy duty equipment, stated his opinion that from a safety standpoint, the LeTorneau dozer was both unreasonably dangerous and negligently designed. Mr. Waleson suggested that the LeTorneau dozer should have incorporated the use of a toehold, a perforated plate for stepping to be located on the A-frame, and some handholds or grabrails which could be utilized by the user in negotiating the first step in mounting (or the last step in dismounting) from the machine. John H. Hyler, a Westinghouse employee who had participated in the design of the LeTorneau dozer in question, disagreed with Mr. Waleson, and asserted that the modifications suggested by Waleson were completely impractical as such safety features would have been sheared off by debris which could accumulate between the wheels. Mr. Hyler reasoned that due to this exposure to flying debris, the suggested safety features would create further hazards. In response, Mr. Waleson suggested that the hypothetical handholds and toeholds could be made of flexible wire rope, which would bend according to any stress or force placed upon the handholds or toeholds, and then flex back to their original configuration.

## I. PLAINTIFF'S MOTION TO AMEND UNDER FEDERAL RULE OF CIVIL PROCEDURE 15(b).

■ Although plaintiff Nerenhausen was aware of the defendant's third party complaint for almost two years, and even though no jurisdictional problem was present, plaintiff did not move to amend his complaint to assert a claim directly against Westinghouse until after the opening statements were completed. That motion was made off the record. The motion was renewed on the record the following day after the testimony of plaintiff and certain railroad employees. In light of the unreasonable delay and the tactical prejudice to Westinghouse, the Court denied plaintiff's motion to amend. At that time, as plaintiff

had completed his testimony, Westinghouse's claim of prejudice focused on its strategy to not pursue the scope of plaintiff's injuries on cross examination, and failure of Westinghouse to prepare to respond directly to plaintiff's claimed injuries. The present motion by plaintiff for a judgment in its favor against Westinghouse is inextricably bound to the denial of its previous motion.

Plaintiff, in seeking to have the judgment altered so as to allow him to recover directly from third party defendant Westinghouse, relies on Federal Rule of Civil Procedure 15(b), which provides in pertinent part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Plaintiff argues that such an amendment is permissible here, as the proposed amendment does not raise issues which were not litigated at trial between the parties.

The Court has determined that plaintiff's reliance on Rule 15(b) is inappropriate, as the issues involving the liability of third party defendant Westinghouse were simply not tried with the consent of Westinghouse due to Westinghouse's opposition to plaintiff's motion to amend made during the course of the trial and the Court's ruling on the motion. In light of the untimely and unfair manner in which plaintiff moved to amend its complaint during trial, as well as the tactical prejudice to Westinghouse, the Court denied the motion. When a party objects to a proposed amendment, and such an objection is upheld, any factual issues which are raised during trial are not tried with the express or implied consent of the

objecting party,[1] such as Westinghouse here. *American Hot Rod Association, Inc. v. Carrier*, 500 F.2d 1269, 1275 (4th Cir. 1974); *McGraw v. Matthaei*, 388 F.Supp. 84 (E.D.Mich.1972). Despite the hypothetical depletion of judicial resources should plaintiff initiate a new lawsuit against Westinghouse,[2] there is plainly no consent within the meaning of Fed.R.Civ.P. 15(b) as to the issues regarding Westinghouse's liability to the plaintiff, and therefore plaintiff's motion to amend and alter the judgment to recover directly against third party defendant Westinghouse is hereby denied.

## II. THIRD PARTY DEFENDANT WESTINGHOUSE'S MOTION TO ALTER THE JUDGMENT OR IN THE ALTERNATIVE FOR A NEW TRIAL.

Third party defendant Westinghouse has moved for an order altering judgment in their favor or alternatively for a new trial. Westinghouse's motion to alter the judgment is, in effect, a motion for judgment notwithstanding the verdict and must be evaluated pursuant to the standards developed under Fed.R.Civ.P. 50. It is well established that in evaluating a motion for judgment notwithstanding the verdict, the trial court is:

(1) to consider the evidence in the light most favorable to the * * * parties prevailing with the jury; (2) to assume that all conflicts in the evidence were resolved * * * in favor of the [prevailing parties]; (3) to assume as proved all facts which [the prevailing parties'] evidence tends to prove; (4) to give the [prevailing parties] the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to deny the motion if, reviewing the evidence in this light, reasonable men could

differ as to the conclusion to be drawn from it.

*Voegeli v. Lewis*, 568 F.2d 89, 92 (8th Cir. 1977); *Griggs v. Firestone Tire & Rubber Co.*, 513 F.2d 851, 857 (8th Cir.), *cert. denied*, 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Hanson v. Ford Motor Co.*, 278 F.2d 586, 596 (8th Cir. 1960). The standards governing motions for new trials are somewhat different. A motion for a new trial is addressed to the sound discretion of the trial court. *Sanden v. Mayo Clinic*, 495 F.2d 221 (8th Cir. 1974). While the trial court may grant a new trial and set aside the verdict even though substantial evidence exists to support the verdict, in exercising its discretion, the trial court should not grant a motion for a new trial unless the Court is convinced that the verdict is against the clear weight of the evidence or that a miscarriage of justice has occurred. *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 187 (8th Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973); *Seven Provinces Insurance Co., Ltd. v. Commerce & Industry Insurance Co.*, 65 F.R.D. 674, 688 (W.D.Mo.1975).

Applying these standards, it is manifestly apparent that the respective motions of Westinghouse should be denied, as more than substantial evidence exists to support the verdict, and in the view of the Court, no miscarriage of justice would result if the jury's special verdict was upheld. Westinghouse argues that the evidence is insufficient to support the verdict by arguing that in the 20 year period in which the railroad owned the machine, Westinghouse purportedly received no safety related complaints from any of its customers. Furthermore, Westinghouse reasons that evidence indicating that the left side of the machine was

---

1. As the cases [*Wasik v. Borg*, 423 F.2d 44 (2d Cir. 1970) and *Falls Industries, Inc. v. Consolidated Chemical Industries, Inc.*, 258 F.2d 277 (5th Cir. 1958)] cited by plaintiff involved no motion to amend or any objection by a third party defendant whatsoever as to litigating the claim asserted by plaintiff, the requirement of Rule 15(b) that the issues be tried with the consent of the parties was not an issue, and the cases are therefore inapposite.

2. In this regard a subsequent trial may or may not be necessary. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Pacific Indemnity Co. v. Thompson-Yaeger, Inc.*, 260 N.W.2d 548 (Minn. 1977).

designed for mounting and dismounting, that the machine was designed for only one person, and that certain alterations of the dozer were made by the railroad all justify altering the judgment in its favor. In light of these arguments and *Halvorson v. American Hoist & Derrick Co.*, 307 Minn. 48, 240 N.W.2d 303 (1976), Westinghouse reasons that as a matter of law there is no unreasonably dangerous defect which proximately caused plaintiff's injuries, and therefore its motions should be granted.

In *Halvorson v. American Hoist & Derrick Co., supra*, the Minnesota Supreme Court held that plaintiff, as a matter of law, could not recover in strict liability or on a negligence theory in his claim that a crane which had contacted a power line and thereby caused plaintiff's injuries was defective or negligently designed because of the absence of safety devices. The *Halvorson* court reasoned that the manufacturer defendant owed no duty to the plaintiff to install safety devices where the risk of electrocution was obvious, specifically warned against by the manufacturer, and where the risk was known by all employees involved. The *Halvorson* case is simply inapposite, as the record developed at trial does not support the notion that all or any of the railroad employees appreciated the risk of injury in dismounting from the LeTorneau dozer. Moreover, there was absolutely no warning with respect to the risks inherent in the dismounting process in the operators manual which accompanied the LeTorneau dozer. More importantly, no instructions as to dismounting were provided in the manual, nor did this manual direct the user to mount or dismount from the left side of the machine. In short, Westinghouse failed to design or incorporate safety features with respect to the LeTorneau dozer, and provided no warning or instruction as to how operators were to accomplish the task of mounting or dismounting the dozer. Under the circumstances, the *Halvorson* decision is of no assistance to Westinghouse.

Furthermore, while Westinghouse argues that the LeTorneau dozer was only designed to be used by one person, and plaintiff therefore should not have been on the machine, this contention has little merit, as the risk of injury in the absence of safety features to aid in mounting or dismounting was equal for all users no matter how many people were on the dozer. Also, while Westinghouse contends that railroad induced alterations of the machine in adding a canvas shroud contributed to plaintiff's injuries, the evidence adduced at trial only established that if any canvas attachment on the machine existed at the time of plaintiff's injuries, it was not a factor in increasing any risk of injuries in the dismounting process. Finally, Westinghouse argues that the damages awarded plaintiff Nerenhausen are excessive, although it fails to identify any reasons to support its contention. The Court has concluded that there was substantial evidence to support the jury's verdict with respect to damages. Therefore, as the arguments of Westinghouse have no merit, the respective motions of Westinghouse are denied.

### III. THE RAILROAD'S MOTION FOR INDEMNITY.

The railroad, after recovering $75,000 on its claim of contribution against third party defendant Westinghouse pursuant to the jury's assessment of the relative fault of these parties, has now moved to be indemnified as to the remaining $75,000. With respect to the railroad's claim for contribution, the jury found Westinghouse liable under both a negligence and a strict liability theory. The railroad's argument with respect to the indemnity issue is essentially twofold. First, the railroad contends that because Westinghouse breached a duty owed to the railroad, indemnity is appropriate under "Rule 3" of *Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 104 N.W.2d 843 (1960). Second, the railroad contends that because any fault which can be attributed to the railroad can only be characterized as a failure to guard against defects inherent in the design of the LeTorneau dozer, it was improper for the Court to allow the jury to assess the relative culpability between Westinghouse and the railroad under *Busch v. Busch Construction, Inc.*, 262 N.W.2d 377 (Minn.1977).

A. The Railroad's Entitlement to Indemnity under Rule 3 of *Hendrickson.*

■ Indemnity is the right of one party held liable to another to shift the entire burden of liability to a third party also liable for the same harm. *Hendrickson v. Minnesota Power & Light Co., supra.*[3] In *Hendrickson*, the Minnesota Supreme Court articulated five situations where indemnity would generally be allowed:

(1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged.

(2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of, and in reliance upon the one sought to be charged.

(3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.

(4) Where the one seeking indemnity has incurred liability merely because of failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged.

(5) Where there is an express contract between the parties containing an explicit undertaking to reimburse for liability of the character involved.

*Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 372–73, 104 N.W.2d 843, 848 (1960) (footnotes omitted).

The recent transformation of the law of indemnity in Minnesota began with *Tolbert v. Gerber Industries, Inc.*, 255 N.W.2d 362 (Minn.1977), where the court rejected Rule 4 of *Hendrickson* as a basis for indemnity, thus in part overruling *Hendrickson.* The court concluded that the application to indemnitors of Rule 4 was too onerous as it allowed parties who were culpably negligent to avoid financial responsibility entirely. *Id.* at 366–67. The factual context of *Tolbert* involved Schuler, a defendant manufacturer of a grain and seed elevator which negligently transmitted an improper angle to Voldco, the defendant installer who incorporated the angle in its assembly of the elevator, all in accordance with Schuler's design instructions. As a result of the error in the angle, and Voldco's failure to discover it, the elevator collapsed, injuring plaintiff. The jury found Schuler and Voldco 100% negligent, but did not assess the relative culpability between them. The trial court allowed indemnity in favor of Voldco, but the Supreme Court, after concluding that a prospective indemnitee who has failed to discover or prevent the negligence of another is not entitled to indemnity, reversed for a determination of their relative culpability. Justice Kelly, in a dissenting opinion, disagreed with the majority approach in rejecting Rule 4 as a basis for indemnity for the reasons that the majority approach would render the law of indemnity too inflexible and because as a matter of policy an installer should be granted indemnity where his negligence amounted to a failure to discover a nonobvious defect resulting from a manufacturer's breach of warranty. Reasoning that a manufacturer should bear the ultimate responsibility for its product, Justice Kelly concluded that Voldco should have been entitled to indemnity.

The language of *Tolbert* is of substantial relevance here:

The instant case falls within Rule 4 of *Hendrickson.* In situations covered by Rules 1, 2, and 3, the party who seeks indemnity has been held liable even though not personally at fault. In cases under Rule 1, the liability of the party

---

**3.** In the contribution and indemnity area, Minnesota law generally requires that the tortfeasors share a common liability to the plaintiff. *Hart v. Cessna Aircraft Co.*, 276 N.W.2d 166 (Minn.1979). This requirement, however, is not ironclad, as the Minnesota court has modified it where "necessary to achieve an equitable result . . . ." *Id.* at 169; *Lambertson v. Cincinnati Corp.*, 257 N.W.2d 679 (Minn.1977). While third party defendant Westinghouse is not directly liable to plaintiff Nerenhausen, the liability of Westinghouse was adjudged by the jury in the context of plaintiff's injuries. It necessarily follows that the requirement that the tortfeasors share a common liability should be modified here to reach an equitable result.

seeking indemnity is imposed upon him for the conduct of another. Indemnity in such a case is supported by the fundamental principle that the one who is guilty of injurious misconduct is himself liable therefor. In cases under Rule 2, indemnity is granted to a party who justifiably relied upon representations made by another and thus is without personal fault, but whose actions are nevertheless tortious. In cases under Rule 3, the party seeking indemnity is again without personal fault, but is exposed to liability because of the failure of another to perform a duty which he was legally or contractually obligated to perform. Rule 5 deals with contractual indemnity and is thus distinguishable from Rules 1, 2, and 3 and from Rule 4.

Cases which fall under Rule 4 are of a very different type from the others. Aside from cases of contractual indemnity, the other rules concern parties seeking indemnity who are without personal fault, but who nevertheless are liable in tort. Rule 4, however, concerns parties who are themselves culpably negligent but who nevertheless seek to avoid responsibility for the injury they have caused.

*Id.* (footnotes omitted). As the *Hendrickson* rules (except for Rule 5) which allow indemnity are based on the absence of fault on the part of the prospective indemnitee, and as Rule 4 purportedly allowed a party to be indemnified even though culpably negligent, the *Tolbert* court concluded that Rule 4 must be rejected. Thus, *Tolbert* clearly contemplates that a prospective indemnitee, who seeks to come within Rule 3 of *Hendrickson* by claiming that another party breached a duty, such as the railroad here, must itself be faultless.

The evolution in the indemnity area continued with *Lambertson v. Cincinnati Corp.*, 257 N.W.2d 679 (Minn.1977), wherein the court ruled that a defendant manufacturer was entitled to contribution to some extent from the third party defendant employer, even though the employer had already complied with its obligations under the workers compensation law to the plaintiff employee.

Cincinnati was the manufacturer of a press brake which crushed plaintiff's arm, and which the jury apparently found was the result of the failure of the manufacturer and employer to install safety features. Prior to the accident, the manufacturer offered safety devices to the employer which, if installed, might have prevented the accident. The employer refused the features. On appeal, Cincinnati urged that it was entitled to indemnity from the employer, Hutchinson. The court rejected this contention, stating:

> The difficulty with this argument lies in the jury's unchallenged finding that Cincinnati was 25-per-cent negligent in the first instance, when it placed its press brake in the stream of commerce without certain kinds of safety devices. Since the independent acts of negligent manufacture and sale by Cincinnati and refusal of safety devices by Hutchinson combined to produce plaintiff's injury, liability should be apportioned between them, not shifted entirely to one or the other. Therefore, if Cincinnati is entitled to any remedy, that remedy is contribution.

*Id.* at 688. The rationale employed in *Lambertson* is, like *Tolbert*, one of denying indemnity to a prospective indemnitee who is not without fault. Assuming that a motion for indemnity would have been made by the employer, Hutchinson, it would seem that the identical rationale utilized by the *Lambertson* court would compel that court to deny the employer's hypothetical claim for indemnity. It necessarily follows that the Minnesota court would deny indemnity in this context because of the employer's culpable conduct in failing to insure that safety measures were incorporated into the press brake. Thus, even though Cincinnati arguably breached an implied warranty and thus a duty owed to Hutchinson, thereby arguably coming within Rule 3 of *Hendrickson*, the *Lambertson* court would have denied the employer's claim for indemnity, as the employer itself was culpably negligent. *Tolbert v. Gerber Industries, Inc.*, 255 N.W.2d 362 (Minn.1977). The less than faultless conduct of the railroad is striking-

ly similar to that of the employer in *Lambertson.*

In *Frey v. Montgomery Ward & Co., Inc.,* 258 N.W.2d 782 (Minn.1977), Montgomery Ward, the retailer, brought an action against a third party defendant, the manufacturer of a space heater, which apparently overheated in a house trailer and killed plaintiff's chinchillas. The trial court had dismissed Montgomery Ward's claim against the manufacturer, and on appeal, the court reversed this part of the judgment, although it affirmed the trial court's directed verdict that Wards was negligent because of its failure to warn on the use of the space heater. This latter holding was premised on the imputed knowledge of the conditions in which the space heater was to operate. In remanding the case for trial on the issue of the manufacturer's liability, the majority opinion left it to the trial court to determine if Rule 3 or Rule 4 of *Hendrickson* applied. Justice Kelly filed a concurring opinion, which basically asserted that Wards would be entitled to indemnity because Rule 3 of *Hendrickson* governed, even though Montgomery Ward may have been negligent with respect to the plaintiff. The focal point of Justice Kelly's concurrence again seems to be the breach of warranty by the manufacturer, who, according to Justice Kelly, should ultimately be held responsible because of its position in the chain of distribution. Significantly, Justice Kelly explained why he perceived the situation in *Frey* to fall within Rule 3 of *Hendrickson*:

> But the perspective from which one evaluates a retailer's culpability differs with its position as a distributor or purchaser in the chain of distribution. A retailer may be liable to a consumer by breaching a duty to inspect and protect the consumer from goods he sells. Yet, *as between the retailer and the manufacturer, there may be no negligence because of reasonable reliance on the warranties and exper-*

*tise of the manufacturer.* Indeed, in such a circumstance, the retailer would seem entitled to indemnity from the manufacturer under Rule 3 of *Hendrickson* . . . .

*Id.* at 790–791 [emphasis added]. Justice Kelly's analysis focuses on the reasonableness of the prospective indemnitee's reliance on the expertise or warranties of the manufacturer—prospective indemnitor in a situation involving a breach of implied warranty. This analysis necessarily implies that if such reliance is unreasonable, the prospective indemnitee, such as the railroad here, is not without fault, and thus indemnity may not be proper even if a breach of warranty is present.

The Court has determined that the railroad's claim for indemnity must be rejected, as the railroad cannot be considered faultless under the circumstances, and thus cannot legitimately claim the benefits of Rule 3 of *Hendrickson.* First, even assuming that the design and/or manufacture of the LeTorneau dozer amounted to a breach of implied warranty by Westinghouse, any reliance by the railroad on the implied warranties or expertise of Westinghouse certainly cannot be considered reasonable. As a 20 year period had elapsed in which the railroad could have taken corrective measures to remedy an obvious defect on a machine designed with absolutely no safety features to aid in mounting or dismounting, the Court is compelled to the conclusion that any reliance of the railroad on the warranties of Westinghouse has dissipated to the point where its reliance can only be considered unreasonable. Thus, even under Justice Kelly's analysis in *Tolbert* and in *Frey*, the railroad cannot come within the parameters of Rule 3 of *Hendrickson.* This conclusion is reinforced by the jury's findings, which assessed the relative culpability of Westinghouse and the railroad to be equal.[4] Second, in a related vein, the railroad's failure over the 20 year period in

---

4. In this regard, the jury was instructed as follows:

> In the event that you find that the Milwaukee railroad was negligent by failing to provide a safe place to work and thus liable to John Nerenhausen, and that you find that Westing-

house is either strictly liable or negligent with respect to the design or manufacturing of the LeTorneau dozer, then you should answer the appropriate question on the special verdict form. This question requires you to compare the relative culpability of the conduct of both

which it owned the machine to take any corrective measures with respect to safety features, its failure to provide any warning or instructions to employees on mounting or dismounting, and its arguable negligence with respect to alterations on the machine, all lead to the inevitable conclusion that the railroad is anything but faultless. Moreover, the nature of the railroad's fault is sufficiently similar to the conduct embraced by the rejected Rule 4 of *Hendrickson* to deny indemnity. Therefore, the Minnesota Supreme Court's decisions in *Tolbert* and *Lambertson* compel the conclusion that the railroad is not entitled to indemnity under Rule 3 of *Hendrickson*, as the railroad was not without fault. *Cf.* Minn.St. § 604.01, subd. 1a ("fault" includes an "unreasonable failure to avoid an injury . . . .").

### B. Comparative Fault.

■ In *Busch v. Busch Construction, Inc.*, 262 N.W.2d 377 (Minn.1977), the Minnesota

court rejected a negligent co-defendant's claim for indemnity from a strictly liable manufacturer. *Busch* involved an off the road collision where the driver and passengers of the vehicle were severely injured. Lando Busch, the driver of the vehicle, was both a plaintiff and a defendant in the action. The jury found Busch 15% negligent and found General Motors, the manufacturer of the vehicle, 85% at fault under a strict liability theory due to a malfunction in the steering mechanism. On appeal, the *Busch* court held that the jury can compare the negligence of one party (whether that party is a plaintiff or co-defendant) with the strict liability of another party. However, in an effort to articulate the type of fault which is comparable with a manufacturer's strict liability, the court equated fault which can be compared with a manufacturer's strict liability to the defenses to a strict liability claim under Restatement 2d of Torts § 402A:

the railroad and Westinghouse which ultimately caused the injuries sustained by John Nerenhausen. In the event that you find that plaintiff John Nerenhausen is entitled to recover damages, the relative culpability of the parties whose conduct contributed to plaintiff Nerenhausen's damages determines how the burden of compensating John Nerenhausen will be shared between the railroad and Westinghouse.

A determination of the parties' relative culpability involves a comparison of their fault. The respective degrees of fault between the parties whose conduct contributed to plaintiff Nerenhausen's damages should be compared in two respects. The first centers on causation of the damages in question. There may be more than one direct cause of injury, and if the wrongful conduct of two or more parties directly caused the injury, the conduct of one such party may have been more of a contributing factor to the injury than the conduct of another. The greater the effect of a party's wrongful conduct as a cause of the damages in question, the greater is that party's culpability for the injury sustained. In this sense of culpability, you are to evaluate each party's wrongful conduct in so far as it contributed to cause the damages plaintiff Nerenhausen suffered.

The second respect in which you should compare fault between the parties involves an evaluation of the justifiability of each party's conduct. The less justification for a party's conduct, the greater is that party's culpability. Here, the state of mind of the respective parties, as well as their relationship to each other, are factors which you may consider. For ex-

ample, if a party acts with knowledge that his conduct might wrongfully cause damage or if he should have had such knowledge at the time he acted, he is more culpable than if his conduct was inadvertent or innocent. Similarly, if it was reasonable in the circumstances for one party to rely on another party's greater expertise or knowledge, the culpability of the party who relies on another may be lessened. In this regard, it is generally the case that a manufacturer of a product has greater knowledge of the advantages and disadvantages of his product than does a seller or user of the product. Particular sellers or users, however, may through education or experience acquire as much knowledge as the manufacturer, and perhaps more knowledge if they have dealt with the product in question or with a number of similar products over a period of time. I cite these examples only to indicate the manner in which the culpability of the conduct of the parties may be compared.

I remind you that the culpability of a party should be evaluated in two respects. The first is his wrongful conduct's causal effect, the second is the conduct's justifiability under the circumstances. It is your function to evaluate in both respects the fault of each party charged with wrongful conduct, and then compare the fault of one party against another in order to determine their relative culpability.

Under the Court's instruction, the jury was given ample guidance and flexibility in which to consider whether the railroad's reliance on the expertise of Westinghouse was reasonable under the circumstances.

a consumer's negligent failure to inspect a product or to guard against defects is not a defense and thus may not be compared with a distributor's strict liability. All other types of consumer negligence, misuse, or assumption of the risk must be compared with the distributor's strict liability under the statute.

*Id.* at 394. The *Busch* court however, denied co-defendant Busch's motion for indemnity on the basis that the jury could have found that his "conduct constituted more than mere failure to inspect a product or guard against the existence of a defect." *Id.* Relying on language in *Busch,* the railroad argues that the jury should not have been allowed to compare the negligence of the railroad with the fault of Westinghouse, and therefore the jury's findings should be disregarded. The railroad's argument is legally deficient in a number of respects.

First, by failing to object to the submission of the comparison of fault to the jury, and the railroad's agreement with the special verdict used by the Court, the railroad has waived its right to contend that the Court erred in allowing the negligence of the railroad to be compared with the fault of Westinghouse. *Raach v. Haverly,* 269 N.W.2d 877 (Minn.1978). Moreover, pursuant to the railroad's request, the issue of Westinghouse's negligence was submitted to the jury. The jury, in its assessment of the relative culpability of Westinghouse and the railroad, therefore compared the negligence of the manufacturer with the negligence of the employer railroad, in accordance with the Minnesota court's decisions in *Tolbert* and *Lambertson.* The *Busch* decision does not prohibit a comparison of one party's negligence with the negligence of another.

Apart from the railroad's waiver of this issue, more significant reasons exist to reject the railroad's argument with respect to *Busch.* The Court is of the opinion that

were the Minnesota Supreme Court confronted with the instant circumstances, that court would find that the railroad is not the "user" or "consumer" [5] envisioned by *Busch,* and thus the conduct of the railroad can be compared with that of Westinghouse, the manufacturer. This Court is not inclined to pronounce an all encompassing rule as to who is a user or consumer, so that the failure of such persons to discover or guard against defects can be compared to the strict liability of another. A number of factors are, however, relevant to this Court's conclusion. These factors include: 1) the capacity to discover any defect; 2) the length of time involved in which to discover the defect; 3) the obviousness of the defect; 4) the financial resources of the party who failed to inspect or guard against the defect; 5) whether the product was purchased for the personal use of the party who failed to inspect or guard against the defect; and 6) whether the party who failed to inspect or guard against defects had actual knowledge, or clearly should have had such knowledge, of the existence of the dangerous defect. Here, there is no question that the railroad was culpably negligent. The LeTorneau dozer in issue was purchased for an entrepreneurial purpose, and the railroad had the machine in its possession for approximately 20 years. During this lengthy time period, the railroad did absolutely nothing, despite the capacity and financial resources to do so, to correct an obviously unreasonably dangerous defect. In light of the obvious nature of the defect and the lengthy time frame in which to take affirmative steps to correct such defects, the Court is of the opinion that the railroad clearly should have been aware of the absence of safety features on the dozer, and the risks therefrom.[6] This is not a case of the ordinary purchaser of a product who has neither the expertise, the capacity, the financial resources nor the

---

5. The term "user" or "consumer" was left undefined in *Busch.* Curiously, the opinion omits any reference to retailers, the focal point of Justice Kelly's concurrence in *Frey v. Montgomery Ward & Co., Inc.,* 258 N.W.2d 782 (Minn.1977).

6. Apart from the issue of whether the railroad is a "user" or "consumer" under *Busch,* the conduct of the railroad, in the view of the Court, should be comparable with the fault of the manufacturer under *Busch.* As the railroad should have been aware over the 20 year period of the risks presented by the obvious absence of safety features, its failure to take corrective

time to discover or guard against defects in a product which ultimately causes injury to the purchaser himself. Rather, this case presents the somewhat callous and egregious conduct of an employer who had more than ample notice and time in which to pinpoint and take corrective measures regarding the ultimate safety of equipment used by its employees. The concept of indemnity is an equitable doctrine. *Tolbert v. Gerber Industries, Inc.,* 255 N.W.2d 362 (Minn.1977); *Olson v. Village of Babbitt,* 291 Minn. 105, 189 N.W.2d 701 (1971). Under these circumstances, the Court is convinced that submitting the issue of relative fault or culpability of the employer and the manufacturer to the jury was appropriate under *Busch. Cf. Lambertson v. Cincinnati Corp.,* 257 N.W.2d 679 (Minn.1977). For all these reasons, the railroad's motion for indemnity must be denied.

Accordingly, IT IS HEREBY ORDERED that the respective posttrial motions of all the parties are denied.

measures exposed its employees to a significant risk of injury. In some respects, the railroad's conduct resembles assumption of the risk, a type of fault which is comparable under *Busch.* Prosser, *Law of Torts,* § 68 at 441 (4th Ed. 1971). In any event, the Court is convinced that where a party clearly has reason to know of the existence of an obvious defect and the risks therefrom, and proceeds to expose others to a significant risk of injury through its nonfeasance, such conduct may be compared to a manufacturer's strict liability. *Cf.* Minn.St. § 604.01, subd. 1a ("fault" includes an "unreasonable failure to avoid an injury . . . ."). In this regard, the *Busch* case is factually distinguishable, as the product defect in *Busch* cannot be characterized as an obvious defect.